NOAH A. KATSELL (Bar No. 217090)
noah.katsell@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: 619.699.2700
Fax: 619.699.2701

BARBARA A. DUNCOMBE *(pro hac vice forthcoming)*
bduncombe@taftlaw.com
SUZANNE SUMNER *(pro hac vice forthcoming)*
ssumner@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LP**
1 Indiana Square, Suite 3500
Indianapolis, IN 46204
Tel: 317.713.3461
Fax: 317.713.3699

Counsel for Plaintiff
BAE Systems San Diego Ship Repair Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAE SYSTEMS SAN DIEGO SHIP REPAIR INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, through the DEPARTMENT OF THE NAVY, and its activity, the Southwest Regional Maintenance Center, <br><br> Defendant. | CASE NO. **'22CV515 JAH BGS** <br><br> *Admiralty – Maritime Claims* <br><br> **BAE SYSTEMS SAN DIEGO SHIP REPAIR INC.'S COMPLAINT FOR:** <br><br> **(1) DISPUTE UNDER THE CONTRACT;** <br><br> **(2) BREACH OF CONTRACT (CHANGES);** <br><br> **(3) BREACH OF CONTRACT (SUPERIOR KNOWLEDGE); AND** <br><br> **(4) QUANTUM MERUIT** |

CASE NO. _____

Plaintiff BAE Systems San Diego Ship Repair Inc. ("BAE Systems") brings the following Complaint against the United States of America, acting through the Department of the Navy, Southwest Regional Maintenance Center (the "Defendant" or "Navy"), and states:

## INTRODUCTION

1.      This is a civil action brought by BAE Systems under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101, *et seq.* because the Navy refuses to pay BAE Systems and its subcontractors[1] over $10 million it owes for work performed at the Navy's direction on two Navy ships, the USS DECATUR and USS STETHEM.

2.      As part of its contracts with the Navy, BAE Systems flushed portions of the air systems in the two ships.  The Navy initially found much of BAE Systems' flushing work satisfactory, but then it identified certain administrative deficiencies. These deficiencies resulted in the Navy sampling the ships' air systems and finding evidence of alleged oil contamination.  Without credible evidence that BAE Systems was responsible, the Navy directed BAE Systems to perform costly cleanings and re-flushes of the entirety of the two ships' air systems, which entailed substantially more work and expense than what was required under the contracts. The Navy asserted that BAE Systems and its subcontractor were to blame for the contamination, even though oil was found in many areas BAE Systems never worked on, and therefore could not possibly have been attributable to BAE Systems.

3.      Subsequently, two separate, independent expert investigations confirmed that the oil found in the ships' systems pre-existed the work of BAE Systems.  Senior Navy officials were also aware that this type of oil contamination was likely a legacy ship issue, as oil naturally accumulates in the air systems of this

---

[1] "BAE Systems" as referenced in this Complaint includes subcontractors working on BAE Systems' behalf as the Prime Contractor, as detailed in Paragraph 7, *infra.*

CASE NO. _____

type of destroyer.  In fact, after learning of the DECATUR's and STETHEM's problem, the Navy began investigating and found evidence of similar contamination in another ship on which BAE Systems had not performed flushing work.  Despite expert evidence exonerating BAE Systems, and despite knowledge that oil accumulation was a potential fleet-wide problem, the Navy continued to place all blame on BAE Systems and required BAE Systems to perform, and fund, a massive re-flush of both ships' air systems.

4.     BAE Systems submitted two contractual notice of change letters to the Navy reserving its rights to seek reimbursement for all costs associated with the additional flushing work.  When the Navy continued to direct the work without compensation, BAE Systems submitted Requests for Equitable Adjustment ("REA") to the Government seeking reimbursement for its million-dollar flushing costs.

5.     BAE Systems continued to provide additional information requested by the Navy after it submitted its fully documented REAs. Unable to receive fair compensation through the REAs, BAE Systems submitted formal claims to the Government.

6.     BAE Systems continued to respond to the Navy's requests for additional information, many of which asked BAE Systems to manipulate data already provided in excel spreadsheets, or were duplicative of information BAE Systems previously provided.

7.     On March 8, 2022, BAE Systems received two Contracting Officer's Final Decisions ("COFD") denying in full its claims.  In the COFDs, the Navy admitted that "BAE may be entitled to recover a portion of its costs," but rather than making any payment, the Navy repeatedly demanded additional documents it already had to further delay and deny BAE Systems' claims.  Such conduct has deprived BAE Systems the funds to which it is entitled, and BAE Systems now seeks full compensation for the work performed.

/ / /

8.      For the reasons set forth below, BAE Systems is entitled to $10,946,500.80, plus interest on its asserted claims.

**PARTIES**

9.      Plaintiff BAE Systems is a leading provider of emergency and planned ship repair, modernization, and overhaul services for the U.S. Navy.  BAE Systems has contracted with, and provided these services to the Navy, its primary customer, for more than 50 years.  BAE Systems is a California corporation with its principal place of business located at 2205 E. Belt Street, Foot of Sampson Street, San Diego, CA 92113.

10.     BAE Systems uses subcontractors like South Bay Sandblasting & Tank Cleaning ("SBSBTC"), Pacific Tank Cleaning ("PacTank"), and California Marine Cleaning ("Cal Marine") (collectively, the "Subcontractors") to assist in providing these services to the Navy.  The Subcontractors' interests are asserted in this Complaint.

11.     Defendant is the United States of America, acting through the Department of the Navy, Southwest Regional Maintenance Center, located at 3755 Brinser St., Suite 1, San Diego, CA 92136.  The Navy Contracting Officer is Charles Dupray.  Mr. Dupray's email is charles.dupray@navy.mil.

**JURISDICTION AND VENUE**

12.     Jurisdiction in this Court is proper because (i) this action contains two related claims for maritime matters, i.e., a ship repair issue, brought under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101, *et seq.* (the "CDA") arising from the Contracts at issue; and (ii) these are admiralty and maritime claims under Fed. R. Civ. P. 9(h) and brought, in accordance with CDA § 41 U.S.C. § 7102(d) for "Maritime contracts" under the Suits in Admiralty Act, 46 U.S.C. § 30901, *et seq.*, and the Public Vessels Act, 46 U.S.C. § 31101, *et seq.*

13.     Venue is proper in this Court under 28 U.S.C. § 1391 because (i) CDA §§ 7102(d) and 7104(b) permits BAE Systems to sue in this United States District

CASE NO. _____

Court; (ii) BAE Systems repaired the ships in San Diego, California, but the Navy did not pay BAE Systems and its Subcontractors for all of their services, thus the events giving rise to BAE Systems' claims occurred in this Court's District and Division; (iii) BAE Systems resides and has its principal place of business in San Diego; (iv) the Navy executed the Contract in San Diego; and (v) the Navy has facilities and a presence in San Diego.

14.     BAE Systems is properly requesting service under Fed. R. Civ. P. 4.

## FACTUAL BACKGROUND

### A.     The Contracts.

15.     There are two ship repair contracts at issue here—the USS DECATUR (DDG 73) (the "DECATUR") and the USS STETHEM (DDG 63) (the "STETHEM").  These ships are Arleigh Burke-class guided missile destroyers.  The DECATUR was commissioned in 1998; and the STETHEM was commissioned in 1995.

16.     BAE Systems competed for and was awarded Contract No. N00024-19-C-4455 (the "Decatur Contract") and Contract No. N00024-19-C-4459 (the "Stethem Contract" and collectively the "Contracts") in September 2019 to repair, maintain, and modernize these ships.  The Contracts are attached as **Exhibits 1 and 2**.

17.     During all relevant times, the DECATUR and the STETHEM were located at either BAE Systems' facility in San Diego, California, or at Naval Base San Diego.  The original period of performance (i.e., the Availability) for both the DECATUR and the STETHEM was scheduled from October 1, 2019 – October 22, 2020.

18.     The Contracts' terms and conditions include Federal Acquisition Regulation ("FAR") clause 52.233-1 Alt 1, Disputes (May 2014), which subject the Contracts to the Contract Disputes Act. The Contracts' terms and conditions also include FAR 52.243-1, CHANGES-FIXED PRICE ("the Changes Clause") and

Defense Federal Acquisition Regulation Supplement ("DFARS") clause 252.217-7003, CHANGES.

19.     Among many other things, the Contracts required BAE Systems to clean and flush segments of the DECATUR's and the STETHEM's air systems during the Availability.

**B.      BAE Systems Performed, and the Navy Accepted, Much of the Flushing Work on the Ships' Air Systems.**

20.     In or around September 2019, BAE Systems subcontracted with SBSBTC to clean and flush the "new and disturbed" portions of the DECATUR's and STETHEM's air systems, which included the High Pressure Air (AHP) system, Electronic Dry Air (AED) system, Vital Low Pressure (AVLP) system, and the Non-Vital Low Pressure Air (ALP) system.  The flush was specified to be a "hot water" flush consistent with BAE Systems' prime contract.  Other portions of the ships' air systems were not required to be flushed, and these sections were isolated from the "new and disturbed" sections of the systems for flushing.

21.     Five separate Process Control Procedures ("PCPs") identified the flushing procedures to be performed on the DECATUR.  Three separate PCPs identified the flushing procedures to be performed on the STETHEM.

22.     These PCPs included several Quality Assurance ("QA") checkpoints and Objective Quality Evidence ("OQE") for verification of cleanliness of the piping systems that was achieved as a result of the flushing procedures.  In late 2020, the Navy approved and accepted the OQE and PCPs for certain air systems on both the DECATUR and the STETHEM.

**C.      Navy Discovers Contamination of the Air Systems.**

23.     On or around February 5 through February 8, 2021, the Navy identified OQE recordkeeping discrepancies while reviewing SBSBTC's dry air PCPs for the DECATUR.  This caused them to sample segments of the air systems on the ships.

/ / /

CASE NO. _____

24.     The Navy took swab samples at certain locations in the DECATUR's air systems, including sections that SBSBTC worked on, and other sections SBSBTC had not worked on and that were isolated from the flushed areas, and identified trace amounts of oil, anti-seize, and fragmented metals in both areas.

25.     The Navy then took swab samples of the STETHEM's air systems as the AED system flushing was in process.  These samples also revealed similar contamination, including in areas not worked on by SBSBTC.

26.     The Navy's sampling on the DECATUR and STETHEM used a flawed methodology and did not use proper equipment for this type of testing.

**D.     <u>Navy Was Aware that Arleigh Burke Destroyers Accumulate Contaminants in their Air Systems.</u>**

27.     The Navy knew that the air systems of the Arleigh Burke class of ships may accumulate oil.

28.     On March 6, 2021, the Deputy Commander of Naval Sea Systems Command ("NAVSEA"), wrote an email to his deputy and the Commander of the Navy Regional Maintenance Center regarding the reported air system contamination on DECATUR. The email stated the following:

> "[The NAVSEA Commander] *isn't convinced that this oil hasn't been there before and that it isn't the same on other ships.  He does believe that you could have leak[ing] on some systems internal to the HPAC [High Pressure Air Compressor] that would result in oil in the air system*."

The email requested that the same areas of the AHP system be sampled on a similar destroyer for comparison.

29.     The Navy proceeded to test the systems on the USS CARNEY ("CARNEY"), an Arleigh Burke class ship located in Jacksonville, FL.  At the time, the Navy did not inform BAE Systems that it was testing the CARNEY to determine if the contamination was similar to the DECATUR's.

30.     The Navy sampled the air systems on the CARNEY and found them to be "dirtier than expected."  The samples taken from the CARNEY showed residue

CASE NO. _____

and particulate contamination visually comparable to that found on the DECATUR and the STETHEM.

31.     Despite these results on the CARNEY, the Navy continued to blame BAE Systems for the contamination on the STETHEM and the DECATUR and continued to demand that BAE Systems re-flush and clean the air systems at its own expense without regard to the significant cost and time required to complete the re-flushing as directed by the Navy.

32.     The Navy's knowledge that the air systems on the Arleigh Burke destroyers accumulate contaminants is documented in the Naval Ships' Technical Manual (NSTM).

33.     The NSTM provides that oil accumulation routinely occurs in the air piping systems, and will "normally experience a constant low level oil input."  For these reasons, air systems are supposed to be inspected prior to an Availability to determine whether hydrocarbon contamination may be present.  Although recommended by the NSTM, the Navy does not routinely inspect air systems for such contamination on older destroyers prior to an overhaul period.

34.     The Navy did not inspect the air systems on the DECATUR and STETHEM before their Availabilities commenced in 2019.

**E.     <u>The Navy Directed BAE Systems to Flush the Air Systems Despite Knowing it was not Responsible for the Contamination.</u>**

35.     On or around March 12, 2021, four days after the email which revealed senior Navy leadership believed contaminants were prevalent on Arleigh Burke class ships and pre-existed BAE Systems' work on the DECATUR and the STETHEM, the Navy, BAE Systems, and SBSBTC met to discuss collaboration on a fact-finding investigation and report to address the air system contamination on the DECATUR.

36.     During this meeting, the Navy did not reveal its testing on the CARNEY, or its general knowledge about contamination in the air systems of

Arleigh Burke destroyers.  The Navy maintained that BAE Systems and SBSBTC were wholly responsible for the contamination.

37.     On March 8, 2021, the Navy issued a Stop Work order to BAE Systems to halt its work on the air systems on the ships.

38.     On or around March 17, 2021, without any independent evidence, the Navy issued a Letter of Direction concluding that "[f]lushes conducted by BAE's subcontractor South Bay Sandblasting and Tank Cleaning (SBSTC) resulted in contamination" of the HP, LP, and Dry Air system on board the DECATUR.

39.     Like the DECATUR, the Navy also concluded SBSBTC's flushing contaminated the HP, LP, and Dry Air system on the STETHEM.

40.     On multiple occasions, BAE Systems requested the Navy provide a root cause analysis or other information demonstrating SBSBTC's responsibility for the contamination on both ships.  But the Navy never provided any direct evidence to support its position that SBSBTC was responsible, nor did it reveal its knowledge about contamination on the CARNEY or other Arleigh Burke class ships.

41.     The Navy's only explanation for why it concluded that SBSBTC caused the contamination was that the contamination "had to do with" how PCP 010050-20 was completed on the DECATUR.  The same PCP deficiencies did not exist on the STETHEM, yet the Navy held BAE Systems and SBSBTC responsible just the same.

42.     On or around July 20, 2021, the Navy provided a document purportedly demonstrating BAE Systems' and SBSBTC's culpability for the air system contamination.  This document provided only a timeline describing SBSBTC's alleged administrative deficiencies and the results of the Navy's swab analysis.  The document did not reveal its findings on the CARNEY.  It failed to provide any analysis or conclusions regarding *how* the administrative deficiencies actually caused contamination in the air systems.  Specifically:

/ / /

CASE NO. _____

- The Navy's timeline did not include any direct evidence of SBSBTC responsibility for the contamination.
- The Navy's timeline did not address that its sampling had found contamination in areas that were untouched by SBSBTC.
- The Navy's timeline did not address the Government's own errors in sampling methodology, including use of improper equipment.

43.     The Navy continued to place all blame for the contamination in the air systems on SBSBTC and BAE Systems, holding them responsible for re-flushing the air systems of the DECATUR and the STETHEM at their own cost.

**F.     The Navy's Direction Changed the Requirements of the Contracts.**

44.     On March 11, 2021, BAE Systems submitted a Notice of Change to the Navy, asserting entitlement to an equitable adjustment for cost and schedule impact due to the March 8, 2021, stop work order.

45.     The Navy issued a Letter of Direction on March 17, 2021, directing BAE Systems to re-flush the dry air system on the DECATUR using cleaning agent Navy Oxygen Cleaner ("NOC").

46.     NOC flushing is not normally conducted on surface ships like the DECATUR and the STETHEM.  It requires an extremely specialized, months-long, and expensive re-flush, which plainly exceeds the "hot water" flushing requirements set forth in the Contracts.

47.     None of the contractors who flush air systems in the San Diego area have the equipment to conduct NOC flushing.

48.     The direction to conduct NOC flushing was a significant change to the contract requirements of "hot water" flushing.  It escalated the cost of the flushing significantly and extended the time to complete the work significantly.

49.     On or around April 5, 2021, the Navy directed BAE Systems to flush the STETHEM air systems using NOC also.

/ / /

CASE NO. _____

50.     On April 20, 2021, the Navy rescinded its direction requiring NOC flushes on the STETHEM.  Instead, it directed BAE Systems to conduct the flushes using "Tribasic Sodium Phosphate (TSP)."  This direction required BAE Systems to amend its Process Control Procedures to include Q-inspections and a Non-Volatile Resident (NVR) test using MIL-STD-1622, which further delayed completion of the directed work.

51.     The April 20, 2021, direction exceeded the requirements of the STETHEM Contract.

52.     On or around May 6, 2021, BAE Systems submitted a *second* Notice of Change to the Navy requesting compensation for flushing the four systems on the DECATUR and the re-flushing of the systems on the STETHEM.  The Navy did not respond to BAE Systems' second Notice of Change.

53.     On May 19, 2021, a month after it rescinded NOC flushing direction on STETHEM, the Navy rescinded its direction to conduct NOC flushes on the DECATUR and directed use of TSP on the HP, LP, and Dry Air systems.

54.     The May 19, 2021, direction exceeded the requirements of the DECATUR Contract.

55.     The Navy's direction to use NOC or TSP instead of hot water, and to flush all four systems (not only "new and disturbed" systems) to remove contaminants, exceeded the Contracts' specifications.

56.     The Navy's changing direction on the type of flushing required caused BAE Systems and its subcontractors to incur additional costs and delayed BAE Systems' ability to complete its work on both ships.

**G.      BAE Systems and its Subcontractors Performed Expensive Re-Flushes to the Navy's Satisfaction, at their Cost.**

57.     To expedite the out-of-scope flushing ordered by the Navy, BAE Systems issued purchase orders to subcontractors to perform this additional work—at its cost.

58.     The re-flushing work directed by the Navy extended the Availability for both the DECATUR and the STETHEM.  The DECATUR was pier-side for an additional 164 days, and the STETHEM was pier-side for an additional 200 days due to this extensive flushing work.

59.     Both Contracts provide a daily rate to be paid to the contractor in the event of any extension of the Availability.  These rates are known as daily extension rates and are intended to compensate the contractor for any additional services required for each day the ship remains in drydock or pier-side.  The daily extension rate for an additional pier-side day of the DECATUR and the STETHEM is $14,178.00 each. The Government never paid BAE Systems for the extension to the Contracts.

### H.     Independent Experts Determined the Root Cause of the Contamination was not due to BAE Systems or SBSBTC.

60.     Due to the Navy's failure to provide information to support its allegations about the origin of the contamination (which was based on assumptions about SBSBTC's flushing procedures), both BAE Systems and SBSBTC engaged third-party expert consultants to analyze potential sources of the contamination.

61.     Each consultant, working independently, determined SBSBTC was not responsible for the air systems' contamination on either ship.

62.     The independent and qualified experts identified contamination in areas *not* flushed by SBSBTC, which confirmed that the contamination was not attributable to or a result of SBSBTC flushing activities.

63.     The experts also determined that SBSBTC's limited flushing in the "new and disturbed" segments could not have caused the contamination found by the Navy due to the complete separation of the flush loop from the rest of the systems, and due to the satisfactory OQE for final cleanliness achieved for certain systems.

/ / /

64.    Also, contamination found in the air systems aboard the CARNEY exhibited similarities to the contamination found in the DECATUR and the STETHEM, which further indicated that the air system contamination on the DECATUR and the STETHEM predated any flushing performed by SBSBTC.

65.    The Navy did not sample the air systems on either the DECATUR or the STETHEM prior to the start of either ship's work at BAE Systems, and it has no information that the contamination did not exist before SBSBTC began flushing the systems.

**I.    BAE Systems Exhausted its Administrative Remedies.**

66.    BAE Systems followed all of the requirements of the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101, *et seq.* to seek payment of the additional monies owed to it and its Subcontractors from the Government.

67.    BAE Systems properly submitted on September 8, 2021, and on October 8, 2021, respectively, REAs to the Navy for additional costs incurred on both the DECATUR and the STETHEM.  The REA for the DECATUR requested payment of $6,145,167.922 and the REA for the STETHEM requested payment of $5,288,058.51.

68.    The REAs sought fair and reasonable compensation for the Project Management Organization ("PMO") costs BAE Systems incurred after the Availability ended, as well as added work scope labor costs.

69.    BAE Systems was unable to complete some of its Contracts' work during the Availability, in part, because of the delays associated with the re-flushing directed by the Navy.

70.    BAE Systems provided PMO services during the extended Availability, but the Navy refused to pay BAE Systems for those services.

---

[2] This amount included consultant costs of $75,000, which were based on a current estimate and did not represent the final consultant costs.

CASE NO. _____

71.     To obtain payments owed but not paid to them, the Subcontractors submitted their own requests for equitable adjustment, which were included in BAE Systems' REAs, as detailed below:

### ***SBSBTC's Request for an Equitable Adjustment.***

72.     SBSBTC was a subcontractor to BAE Systems.  SBSBTC was to perform flushing of the "new and disturbed piping" of the various areas of the STETHEM and DECATUR.

73.     As outlined above, SBSBTC took appropriate steps to perform the hot water flush on the air systems, as directed by the work specifications.  SBSBTC completed and the Navy had accepted several segments of flushing work on the DECATUR's air systems as of early March 2021.  SBSBTC had also engaged in work for the STETHEM's Dry Air, HP, and LP systems by March 8, 2021, when the Stop Work Order was issued.

74.     Following concerns regarding SBSBTC's recordkeeping processes, the Government alleged, without providing any credible evidence regarding actual causation, that SBSBTC contaminated the entire air systems on both ships—even in areas not flushed by SBSBTC.

75.     Based on the direction, SBSBTC re-flushed the systems and performed additional work due to the purported contamination on the DECATUR and the STETHEM.  This re-flush included extensive investigation and material compilation for highly-specialized NOC and TSP flushing, above and beyond the basic.

76.     SBSBTC incurred additional costs of $1,051,706.00 to perform the additional flushing work on the DECATUR as directed by the Navy.  This includes $240,687.53 in labor costs, $346,595.25 in material and equipment costs, $9,029.56 in equipment repair costs, $325,517.89 in legal and consulting costs, and $129,876.00 in internal REA and management costs.

77.     SBSBTC incurred additional costs of $144,424.71 to perform the additional flushing work on the STETHEM as directed by the Navy.  This includes

CASE NO. _____

$69,497.71 in expert consulting costs regarding the responsibility for the alleged contamination on the STETHEM, $21,750.00 in external REA legal and consulting costs, and $32,469.00 in internal REA development and preparation costs.  SBSBTC also incurred $20,708.00 in additional materials costs in preparation for the NOC flush.

### *Additional Cost of Cal Marine's Flushing Work on the STETHEM*

78.     Cal Marine was a subcontractor to BAE Systems.  Cal Marine performed work related to the TSP cleaning of the HP Air System on the STETHEM.

79.     As outlined above, the Navy imposed varying additional requirements on how to conduct the flush.  Related to these changes by the Navy, Cal Marine attended multiple meetings with the Navy spanning several weeks, committing substantial internal resources to the efforts.  Prior to completing any work, Cal Marine and the Navy realized that the process control procedure for the work was nearly impossible, requiring five pages of pen and ink changes between May 17, 2021, and September 3, 2021.

80.     Additionally, between May and September 2021, Cal Marine's work was interrupted by electrical issues from non-Cal Marine equipment, including voltage spikes, which damaged heaters and control panels, and grounding issues which forced the ships to shut down flushing operations, on at least three occasions.

81.     Cal Marine also faced several other impacts to its schedule including, without limitation, being barred access to the flush rig at various occasions and being required to shut down at times due to the Navy's onload of dry goods.

82.     Despite these delays, Cal Marine completed all contracted work for the HP Air Systems September 28, 2021.

83.     As a result of the Navy's direction to Cal Marine to change processes and the prolonged debate about the proper course of action, an additional cost of $1,203,386.16 was incurred for Cal Marine's flushing work.  This amount includes

CASE NO. _____

1   $883,696.00 in additional labor costs and $319,690.16 in additional materials and

2   subcontractors costs.

3   ***Additional Cost of PacTank's Flushing Work on DECATUR***

4   84.     PacTank was a subcontractor to BAE Systems.  PacTank performed

5   work related to the re-flushes of the DECATUR.

6   85.     PacTank fully performed its obligations under the PacTank

7   Subcontract.  PacTank completed all contracted work on the DECATUR by July

8   2021.  The appropriate PacTank quality assurance personnel, BAE Systems, and the

9   Navy completed and approved all required inspections.

10   86.     As a result of the Navy's direction to PacTank to change processes and

11   debate the proper course of action with regard to the re-flushes, additional costs of

12   $164,498.00 were incurred toward PacTank's flushing work.  This includes

13   $82,984.00 in additional labor costs and $81,514.00 in additional materials costs.

14   **J.     The Contracting Officer's Final Decision.**

15   87.     The Navy ignored the REAs and did not pay any of BAE Systems' or

16   its Subcontractors' additional costs incurred to perform the out-of-scope re-flushing.

17   88.     On December 10, 2021, BAE Systems converted the REAs into

18   properly certified claims under 41 U.S.C. § 7103(b) and 48 C.F.R § 33.207, which

19   demanded in writing a sum certain as a matter of right and sought a COFD.

20   89.     On March 8, 2022, BAE Systems received the COFDs on the

21   DECATUR and the STETHEM Claims. Both the STETHEM COFD and the

22   DECATUR COFD denied BAE Systems' claims in their entirety.

23   90.     BAE Systems provided substantial documentation to support its claims,

24   including the expert reports that established that neither BAE Systems nor SBSBTC

25   were responsible for the contamination.

26   91.     BAE Systems continued to provide additional documentation and data

27   requested by the Navy, even though the requests included information already in the

28   Government's possession and previously submitted by BAE Systems.

15

92.     The Navy completely denied BAE Systems and its Subcontractors' Claims while acknowledging "the Government believes BAE may be entitled to recover a portion of its costs" and "the Government is willing to consider some entitlement to recovery of costs related to the Government's direction to use Navy Oxygen Cleaner."

93.     The COFDs ignore the well-supported claims filed by BAE Systems and its Subcontractors.

94.     For these and other reasons, the Contracting Officer's denial of BAE Systems' claims without paying the amounts it found BAE Systems had entitlement to are unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contracts and the relevant law and facts.

95.     The Court should not allow the COFDs to stand and should require the Navy to compensate BAE Systems and its Subcontractors for the changed work the Navy directed them to perform.

96.     The Court should grant BAE Systems and SBSBTC attorney fees because the COFD's unreasonable actions constitute an abuse of discretion and are not in accordance with the terms of the Contracts and relevant law and facts.

97.     As a result of the Navy's unreasonable COFDs, BAE Systems seeks to recover these amounts under each of its following theories. BAE Systems further reserves its rights to seek interest on the amounts incurred from the filing of the claim.

| USS DECATUR | |
|---|---|
| **Cost** | **Amount Owed** |
| Subcontractor Purchase Orders: | $1,485,214.00 |
| Labor and Rental Costs: | $646,678.26 |
| Daily Extension Costs: | $2,325,192.00 |

CASE NO. _____

| USS DECATUR | |
|---|---|
| **Cost** | **Amount Owed** |
| Consultant Costs: | $28,206.00 |
| Subcontractor REA Costs SBSBTC: | $1,051,706.00 |
| Subcontractor REA Costs PacTank: | $164,498.00 |
| **Total** | **$5,701,494.26** |

| USS STETHEM | |
|---|---|
| **Cost** | **Amount Owed** |
| Subcontractor Purchase Orders: | $488,090.55 |
| Labor and Rental Costs: | $555,851.16 |
| Daily Extension Costs: | $2,835,600.00 |
| Consultant Costs: | $17,654.00 |
| Subcontractor REA Costs SBSBTC: | $144,424.71 |
| Subcontractor REA Costs Cal Marine: | $1,203,386.16 |
| **Total** | **$5,245,006.58** |

CASE NO. _____

| USS DECATUR and USS STETHEM | |
|---|---|
| **Cost** | **Amount Owed** |
| USS DECATUR | **$5,701,494.26** |
| USS STETHEM | **$5,245,006.58** |
| **Total** | **$10,946,500.80** |

## COUNT I

### DISPUTE UNDER THE CONTRACT—APPEAL OF THE FINAL DECISION

98.     BAE Systems repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

99.     BAE Systems and its Subcontractors successfully completed all of the work required under the Contracts or requested of them by the Navy, including the changes directed in writing by the Contracting Officer, and have complied with all prerequisites and conditions precedent for filing this action.

100.   The Contracts' terms and conditions include the Federal Acquisition Regulations Changes Clause, which entitles BAE Systems to payment for any changes that cause an increase in the *cost* of, or the *time* required for, performance of any part of the work under the Contracts as made in writing by the Contracting Officer.

101.   BAE Systems' damages include the additional Subcontractor costs and damages due to the Navy's changes that caused an increase in the cost of, or the time required for, performance of any part of the work under the Contracts.

102.   Besides BAE Systems' costs associated with the changes to the Contracts' work, BAE Systems also incurred additional costs to support the

/ / /

CASE NO. _____

DECATUR and the STETHEM for a period of time beyond the ships' Availabilities due to the Navy's delay and expanded scope of work.

103.   In spite of its acknowledgment that it is responsible for some costs incurred by BAE Systems and its Subcontractors as a result of the changed work, the Navy failed to provide any compensation requested for such changes, both directed and constructive, and for such changes in conditions, means and methods of performance, and schedule.

104.   As a result of these contractual failures, BAE Systems and its Subcontractors have a right to recover the entire amount of the incurred damages resulting from the Navy's delays and the Navy's changes in the amount of $**10,946,500.80** plus interest, costs, and fees as may be allowable under applicable federal law or such other amount as the evidence may reveal.

105.   BAE Systems seeks the adjustment requested in Count I only as an alternative pleading to the amount sought in Counts II, III, and IV.

<u>**COUNT II**</u>

**BREACH OF CONTRACT (Changes)**

106.   BAE Systems repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

107.   BAE Systems and its Subcontractors successfully performed all of their obligations and have complied with all prerequisites and conditions precedent under the Contract and have a right to fair and reasonable compensation for their work as an equitable adjustment for the cost of the Navy's changes to the Contracts.

108.   Under the Contracts, BAE Systems is entitled to payment for any changes in the work scope, means, and methods of performance and is also entitled to an equitable adjustment for the cost of such changes and expenditures.

109.   Under Federal Acquisition Regulations § 43.204(b)(1), the Navy must negotiate such equitable adjustments under the Contracts and settle all outstanding

/ / /

changes in the "shortest practicable time."  The Navy has failed to do so despite admitting BAE Systems and its Subcontractors are entitled to equitable adjustments.

110.   As a result of the Navy's failure to pay BAE Systems and its Subcontractors, the Navy has breached the Contracts including, but not limited to, its obligations under the Federal Acquisition Regulations relating to contract performance and settling changes.

111.   The Navy's failure to pay for the changed work directed by the Navy, successfully completed by BAE Systems and its Subcontractors, and accepted by the Navy is a breach of the Contracts and has damaged BAE Systems in the amount of **$10,946,500.80.**

112.   The Navy's breach of the Contracts has also damaged BAE Systems causing it to lose the time value of the money that the Navy owes BAE Systems and in having to expend significant amounts of legal and administrative costs to pursue this action.

113.   BAE Systems thus seeks breach of contract damages of $**10,946,500.80** as outlined in the Claims, plus such interest, cost, and fees as may be allowable under applicable Federal Law, or such other amount as the evidence may reveal.

114.   BAE Systems seeks the adjustment requested in Count II only as an alternative pleading to the amount sought in Counts I, III, and IV.

## COUNT III

### BREACH OF CONTRACT (Superior Knowledge)

115.   BAE Systems repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

116.   Prior to directing BAE Systems and its Subcontractor SBSBTC to perform a NOC flush on the DECATUR and the STETHEM, the Navy had superior knowledge that the air system contamination was a legacy issue for this class of destroyers, but failed to disclose it to BAE Systems or its Subcontractors.

/ / /

117.   The Navy tests on the USS CARNEY confirmed the air system contamination existed on other ships and, therefore, was unrelated to the flushing of the systems on the DECATUR and the STETHEM.

118.   Even after confirming this information and obtaining this superior knowledge, the Navy maintained its position that the contamination was the fault of BAE Systems and its Subcontractors.

119.   The Navy's failure to share its knowledge about contamination in the air systems on legacy Destroyer class ships prior to directing BAE Systems to perform changed flushing requirements, demonstrates a failure to cooperate with and not to hinder BAE Systems' performance.

120.   The Navy's failure to cooperate in negotiating and settling its changes to the Contracts despite its superior knowledge of the issue, is a breach of the Contracts.

121.   The Navy's breach has also damaged BAE Systems causing it to lose the time value of the money that the Navy owes BAE Systems and in having to expend significant amounts of legal and administrative costs to pursue this action.

122.   BAE Systems thus seeks breach of contract damages of $**10,946,500.80** as outlined in the Claims, plus such interest, cost, and fees as may be allowable under applicable Federal Law, or such other amount as the evidence may reveal and any other relief the Court deems proper.

123.   BAE Systems seeks the adjustment requested in Count III only as an alternative pleading to the amount sought in Counts I, II, and IV.

### COUNT IV

### QUANTUM MERUIT

124.   BAE Systems repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

125.   As explained above, BAE Systems provided additional and/or changed work, and applied additional labor, manpower, materials, subcontractors, and

CASE NO.   _____

equipment as required to fulfill the Navy's directions (the "Additional Work"), even when those instructions exceeded the Contracts' requirements.

126.   If the Court determines that BAE Systems' performance of the Additional Work was not a change under the Contracts, then BAE Systems seeks to recover under a quantum meruit claim.

127.   The Navy requested BAE Systems and its Subcontractors perform the Additional Work.  But the Navy and BAE Systems and its Subcontractors did not agree on the price the Navy would pay for the Additional Work.

128.   The Navy received the benefit of the Additional Work but has not paid BAE Systems and its Subcontractors for that work.

129.   It would be inequitable for the Navy to benefit from BAE Systems and its Subcontractors' efforts and expenditures in performing the Additional Work under the Contracts, without paying a reasonable or fair value for that work.

130.   The Navy benefitted from the Additional Work in the amount of $**10,946,500.80**

131.   The Navy should have to pay as quantum meruit damages to BAE Systems and its Subcontractors the amount of $**10,946,500.80** or such additional amounts as the evidence may reveal.

132.   BAE Systems seeks the amount requested in Count IV only as an alternative pleading to the amount sought in Counts I, II, and III.

## **PRAYER FOR RELIEF**

WHEREFORE, BAE Systems respectfully requests that this Court enter judgment in BAE Systems' favor and against the Navy and award the following relief:

A.      Award BAE Systems $**10,946,500.80** under the Contracts' terms for work successfully completed and accepted;

B.      Award BAE Systems post-judgment and pre-judgment interest as permitted under any applicable legal theory, the Contract, statute, or regulation, including, without limitation, the CDA;

CASE NO. _____

1    C.    Award BAE Systems its costs and attorneys' fees incurred to the full

2  extent permitted under any applicable legal theory, the Contract, statute, or regulation;

3  and

4    D.    Grant such other and further relief as the Court deems just and proper to

5  award BAE Systems a complete remedy.

6

7                                Respectfully submitted,

8  Dated:  April 14, 2022         **DLA PIPER LLP (US)**

9                                By:  _/s/Noah A. Katsell_____

10                                      NOAH A. KATSELL

11                                **TAFT STETTINIUS & HOLLISTER, LP**
                                      BARBARA A. DUNCOMBE
12                                      SUZANNE SUMNER

13                                      Counsel for Plaintiff
                                      BAE Systems San Diego Ship Repair,
14                                      Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

CASE NO.  _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF EXHIBITS**

| Exhibit | Description | Page(s) |
|:---:|:---|---:|
| **1** | Contract No. N00024-19-C-4455 (the "Decatur Contract"), awarded September 7, 2019 | **25 – 131** |
| **2** | Contract No. N00024-19-C-4459 (the "Stethem Contract"), awarded September 7, 2019 | **132 - 274** |

CASE NO.   _____