UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAE SYSTEMS SAN DIEGO SHIP REPAIR INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: 22-cv-00515-L-BGS<br><br>**ORDER:**<br><br>(1) **GRANTING DEFENDANT'S MOTION FOR A PROTECTIVE ORDER,**<br><br>(2) **GRANTING THE PARTIES' JOINT MOTION TO FILE UNDER SEAL EXHIBIT 1, AND**<br><br>(3) **GRANTING PLAINTIFF'S MOTION TO FILE UNDER SEAL EXHIBIT 1 TO PLAINTIFF'S SUPPLEMENT TO JOINT STATEMENT**<br><br>**[ECF 33, 34, and 40]** |

On March 8, 2023, the parties filed a Joint Statement regarding the United States' Motion for a Protective Order under Federal Rule of Civil Procedure 26(c). (ECF 33.) In relevant part, BAE Systems San Diego Ship Repair, Inc., Plaintiff, served deposition notices for United States Navy Vice Admirals Galinis and Kitchener, Rear Admiral Haycock, and Rear Admiral Ver Hage. In response, the United States of America, acting through the Department of the Navy, Southwest Regional Maintenance Center,

Defendant, has moved for the Court to enter a protective order precluding Plaintiff from deposing the four on the basis that they are protected by the "Apex" doctrine.[1] (*Id.*)

On February 27, 2023, the parties placed a joint call to this Court with a discovery dispute over the deposition of the four witnesses. (*See* ECF 30.) This Court ordered the parties to file a joint brief regarding the dispute. (*Id.*) The parties have filed the joint brief (ECF 33) and a joint motion to file documents under seal (ECF 34), Plaintiff has filed a supplemental document (ECF 39), and a motion to file documents related to the supplemental document under seal (ECF 40), and Defendant has filed a response to Plaintiff's supplemental document (ECF 42).

For the following reasons, the Court GRANTS the parties' joint motion for Permission to File Under Seal Exhibit 1 (ECF 34) and Plaintiff's motion for Permission to File Under Seal Exhibit 1 to Plaintiff's Supplement to Joint Statement (ECF 40). The Court declines to consider Exhibit 1 to Plaintiff's Supplement, however. The Court also declines to consider Plaintiff's supplemental document. (ECF 39.) The Court GRANTS Defendant's motion for a protective order. (ECF 33.)

I.      BACKGROUND

Plaintiff provides "emergency and planned ship repair, modernization, and overhaul services for [Defendant]." (Compl. [ECF 1] ¶ 9.) Plaintiff uses subcontractors including South Bay Sandblasting & Tank Cleaning, Pacific Tank Cleaning, and California Marine Cleaning. (Compl. ¶ 10.)

In September 2019, Plaintiff was awarded contracts to repair, maintain, and modernize the USS Decatur and the USS Stethem, which are "Arleigh Burke-class guided-missile destroyers." (Compl. ¶¶ 2, 15-16.)

---

[1] "Under the Apex doctrine (also referred to as the *Morgan* doctrine), high-ranking government officials are not subject to deposition absent extraordinary circumstances." *Barlow v. Washington*, No. C20-5186 BHS, 2021 WL 5910485, at *1 (W.D. Wash. Jan. 4, 2021) (citing *U.S. v. Morgan*, 313 U.S. 409, 421-22 (1941)).

As part of its contracts with Defendant, Plaintiff flushed portions of the two ships' air systems. (Compl. ¶ 2.) Plaintiff alleges that Defendant found deficiencies in the air systems, which prompted it to sample them. (Compl. ¶ 2.) Defendant then found evidence of alleged oil contamination. (*Id.*) Defendant asserted that Plaintiff and Plaintiff's subcontractor were to blame for the contamination. (*Id.*)

Plaintiff alleges that in March and April 2021, Defendant directed Plaintiff to re-flush the dry air systems on both ships using Nitrogen Oxide Cleaner (NOC). (Compl. ¶¶ 45, 49.) Later in April 2021 and in May 2021, Defendant directed Plaintiff to use Tribasic Sodium Phosphate (TSP) instead. (Compl. ¶¶ 50, 53.) Plaintiff alleges that NOC flushing "is not normally conducted on surface ships like the Decatur and Stethem" (Compl. ¶ 46), and that NOC flushing was "a significant change to the contract requirements of 'hot water' flushing" (Compl. ¶ 48).

While the ships were being cleaned, Defendant sampled air systems in the USS Carney, another Arleigh Burke-class ship, which was located in Jacksonville, Florida. (Compl. ¶ 29.) Plaintiff alleges that the Carney's air systems were "dirtier than expected." (Compl. ¶ 30.) Plaintiff also alleges that "contamination found in the air systems aboard the Carney exhibited similarities to the contamination found in the Decatur and the Stethem, which further indicated that the air system contamination on the Decatur and Stethem predated any flushing performed by [Plaintiff's subcontractor]." (Compl. ¶ 64.)

Plaintiff alleges that its "independent and qualified experts identified contamination in areas not flushed by [Plaintiff's subcontractor], which confirmed that the contamination was not attributable to or a result of [the subcontractor's] flushing activities." (Compl. ¶ 62.) In March 2022, after Plaintiff submitted Requests for Equitable Adjustment to the Government and was unable to get compensated, Plaintiff submitted formal claims to the Government. (Compl. ¶ 5.) Plaintiff sought reimbursement for all costs associated with the additional flushing work. (Compl. ¶¶ 4, 5.) On March 8, 2022, in two Contracting Officer's Final Decisions, Plaintiff's claims

were denied.  (Compl. ¶ 7.)  On April 14, 2022, Plaintiff filed the Complaint in this case.  (ECF 1.)  Plaintiff's Complaint asserts four claims:  (1) Dispute Under the Contract; (2) Breach of Contract (Changes); (3) Breach of Contract (Superior Knowledge); and (4) Quantum Meruit.  (*Id.*)

## I. MOTIONS TO SEAL AND SUPPLEMENTAL DOCUMENT

In accordance with the Civil Local Rule 79.2, Judge Skomal's Chambers' Rules, and the parties' Stipulated Protective Order Regarding Confidential Information, the parties jointly move to file Exhibit 1 to the Declaration of Alex E. Wallin (ECF 33-2) under seal (ECF 24), and Plaintiff moves to file Exhibit 1 to its supplemental document (ECF 39), under seal.  In the joint motion, the parties designate Exhibit 1 as "Confidential" in accordance with the protective order in this case.  (ECF 34 at 2.)  The parties describe Exhibit 1 as "an email thread including several Navy personnel that discusses, among other things, information regarding Navy ships that [the Navy] claims should be protected from public disclosure."  (ECF 34 at 2.)  Plaintiff seeks to file Exhibit 1 to the supplement as "Confidential" in accordance with the protective order as well.  (ECF 40.)

Unlike judicial records that have been attached to a dispositive motion, judicial records attached to "[n]on[-]dispositive motions 'are often unrelated, or only tangentially related, to the underlying cause of action,' and, as a result, the public's interest in accessing dispositive materials does 'not apply with equal force' to non-dispositive materials." *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).  "A 'good cause' showing will suffice to seal documents produced in discovery."  *Kamakana*, 447 F.3d at 1180 (citing Fed. R. Civ. P. 26(c)).  "For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted."  *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002).

After examining the Exhibit 1 to the joint motion and Exhibit 1 to the supplement, the Court concludes there is good cause to seal both exhibits because information in the exhibits fits within "confidential information" in the protective order. *See East West Bank v. Shanker*, No. 20-cv-07364-WHO, 2021 WL 4916729, at *1 (N.D. Cal. Aug. 31, 2021) ("There may be good cause to seal records that are privileged, contain trade secrets, contain confidential research, development or commercial information, or if disclosure of the information might harm a litigant's competitive standing." (internal quotation marks omitted)).

Plaintiff has also filed a Supplemental Document, which Plaintiff states includes documents Plaintiff has just received from Defendant in discovery that support Plaintiff's position in the parties' joint motion. (ECF 39 at 2.) Defendant objects to the supplement, noting that Plaintiff unilaterally filed it, failed to meet and confer with Defendant before filing it, and provided Defendant no notice that it would be filing it. (ECF 42 at 2.)

Under Judge Skomal's Chambers' Rules, parties are required to meet and confer if they have a discovery dispute. Judge Skomal's Chambers' Rules, Section V.B. After doing so, the parties must contact Chambers and speak with the research attorney assigned to the case. *Id.* The Court will then either schedule a further telephonic discovery conference or advise the parties to file a motion. *Id.*

With regard to the depositions at issue, the parties met and conferred and then contacted Chambers and spoke to the research attorney assigned to their case. (*See* ECF 30.) The Court ordered that the parties file the Joint Statement in this case "no later than the close of business on 3/13/2023." (*Id.*) The parties' Joint Motion and Motion to Seal were filed on March 8, 2023. Plaintiff's Supplemental Document and a Motion to Seal the documents in the Supplemental Document were filed on March 22, 2023. As Defendant notes, Plaintiff did not try to meet and confer with Defendant regarding the additional documents included in the supplement and did not contact Chambers regarding the additional documents included in the supplement. *See* Judge Skomal's Chambers' Rules, Section V.B. Further, Plaintiff's Supplemental Document was filed nine days

after the parties' deadline to file their joint statement, and unilaterally.  (*See* ECF 30.)  Plaintiff has followed none of the procedures under Section V.B.  As a result, the Court will not consider the Supplemental Document.[2]

## II.   APEX DEPOSITIONS

"Courts have often observed that discovery seeking the deposition of high-level executives (so-called "apex" depositions) creates a tremendous potential for abuse or harassment that may require the court's intervention for the witness's protection under Rule 26(c)."[3]  *Conforto v. Mabus*, No. 12cv1316-W (BLM), 2014 WL 12560881, *6 (S.D. Cal. Sept. 24, 2014) (internal quotation marks omitted).  "In order to avoid an apex deposition, the individual must first show that he or she is sufficiently high-ranking to merit protection."  *Id.*  If the individual is sufficiently high-ranking, "the burden switches to [the party seeking the deposition] to demonstrate the need for the testimony."  *Id.* at *7.  The party with the burden must show the following:

> (1) the official's testimony is necessary to obtain relevant information that is not available from another source; (2) the official has first-hand information that cannot reasonably be obtained from other sources; (3) the testimony is essential to the case at hand; (4) the deposition would not significantly interfere with the ability of the official to perform his government duties; and (5) the evidence sought is not available through less burdensome means or alternative sources.

*Id.* at *6.  "In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods."  *Id.*  "If, however, the official is removed from the daily

---

[2] Further, Plaintiff has not identified how the content of the supplemental document supports its arguments.  Basically, Plaintiff has just filed emails expecting the Court to sort through them for anything relevant.  The Court declines to do so.

[3] "A party or any person from whom discovery is sought may move for a protective order . . . ."  Fed. R. Civ. P. 26(c)(1).

subjects of the litigation, [and] has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *Id.* (internal quotation marks omitted) (alteration in original).  "Courts also generally do not permit depositions of high[-]ranking officials to occur before the depositions of lower ranking employees with more direct knowledge of the case have been taken." *Id.*

### A. Defendant's Motion for a Protective Order

Defendant argues that none of the four senior Navy officials Plaintiff seeks to depose has firsthand information that cannot be obtained from another source that would place less of a burden on the officials.  (ECF 33 at 4.)  Defendant argues that none of the officials has unique, non-repetitive knowledge about facts at issue in this case.  (*See id.* at 5.)  Defendant argues that the emails in the exhibit to the joint motion show that the four officials actually have little firsthand or unique knowledge.  (*See id.*)  The emails show that information is being reported to the four officials by less-senior personnel who are directly and intimately involved with the circumstances that are the basis for Plaintiff's claims.  (*Id.* at 5.)  Defendant argues that the highly technical and fact-sensitive issues were pushed up the chain of command by those with firsthand knowledge.  (ECF 33 at 12.)  Defendant also notes that Plaintiff's refusal to consider Defendant's offer to produce less-senior personnel first is an indication that Plaintiff failed to exhaust other, less-intrusive discovery methods.  (*See id.*)  Finally, Defendant notes that Plaintiff has not deposed any witnesses in this case, and notes that courts "generally do not permit depositions of high-ranking officials to occur before the depositions of lower ranking employees with more direct knowledge of the case have been taken."  (*Id.*)

### B. Plaintiff's Response

Plaintiff argues that the critical question in its case is whether the ships' air system contamination and the expected presence of oil was caused by Plaintiff's subcontractor or whether it predated the subcontractor's cleaning work.  (ECF 33 at 7.)   Plaintiff argues, and the Court agrees, that two fundamental questions bear on the critical question in this

case: (1) what the baseline conditions in the two ships were before the flushing, and (2) whether other Navy ships have had similar problems. (*Id.*)

Plaintiff does not dispute that the four officials qualify as high-ranking officials. (*Id.* at 7-8.) Plaintiff argues that the four officials have unique knowledge about the condition of the two ships' air systems and that only they can testify about their statements directing Plaintiff to conduct the "multi-million dollar" system re-flush. *See Karnoski v. Trump*, No. C17-1297MJP, 2020 WL 5231313, at *4 (W.D. Wash. Sept. 2, 2020) ("To demonstrate that exceptional circumstances justify deposing a current or former high-ranking government official, a party must demonstrate the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means." (internal quotation marks omitted)).

Specifically, Plaintiff argues that the four officials have firsthand knowledge about the baseline conditions in the two ships before the flushing and whether other Navy ships have had similar problems. (*Id.*) Plaintiff argues that the four officials had personal involvement in the decision to require Plaintiff to re-flush the ships' air systems, participated in countless meetings, and directed Defendant's position during the course of the events giving rise to this lawsuit. (*Id.* at 8.)

## III. ANALYSIS

### A. High-Ranking Officials

"The President may designate positions of importance and responsibility to carry the grade of general or admiral or lieutenant general or vice admiral." 10 U.S.C. § 601. In June 2020, Vice Admiral William Galinis assumed command as the 45th Commander of Naval Sea Systems Command. (ECF 33-1; Decl. of Kyle Fralick.) He graduated from the Naval Academy in 1983, and throughout his military career, had sea duty assignments, engineering duty officer tours, command assignments, and flag assignments. (*Id.*) On August 3, 2020, Vice Admiral Roy Kitchener assumed the duties as commander, Naval Surface Forces/Naval Surface Force U.S. Pacific Fleet. (Fralick

Decl. Ex G.)  Vice Admiral Kitchener attended the Navy Officer Candidate School and received his commission in 1985.  (*Id.*)

Mr. Michael Haycock, formerly Rear Admiral (lower half) Haycock, retired from his position as rear admiral on July 1, 2019.[4]  (Fralick Decl. Ex H.)  Mr. Haycock graduated from the United States Coast Guard Academy in 1985, previously served in a position with "management oversight of all Coast Guard acquisition programs and projects for the modernization and recapitalization of surface, air, command and control, and logistics assets," and served as the U.S. Coast Guard's Assistant Commandant for Acquisition and Chief Acquisition Officer.  (*Id.*)

In April 2020, Rear Admiral (lower half) Eric Ver Hage assumed duties as commander, Navy Regional Maintenance Center and NAVSEA director, Surface Ship Maintenance and Modernization (SEA 21).  (Fralick Decl. Ex. J.)  Rear Admiral Ver Hage's career includes ship assignments where he served as commanding officer and executive officer, and ashore assignments, where he served as major program manager and was responsible for the design, development, testing, Ballistic Missile Defense System integration, and fielding of a program's capabilities.  (*Id.*)

Vice Admirals Galinis and Kitchener, both presidential appointees, served at the highest level of their military divisions.  As such, the Court considers them high-ranking officials under the apex doctrine.  The Court also considers Rear Admiral (lower half) Ver Hage and former Rear Admiral (lower half) Haycock high-ranking officials.  *See Conforto*, 2014 WL 12560881, *6 (holding that a Navy rear admiral with 38 years of active service who was the current executive director for healthcare operations with a division of the Department of Defense and an admiral who had been the commanding officer at a naval hospital who was the current second-in-command for a division of Navy Medicine were high-ranking officials under the Apex doctrine); *see also United States v.*

---

[4] "Executives and high-ranking officials continue to be protected by the apex doctrine even after leaving office."  *Conforto*, 2014 WL 12560881, at *6.

*Rosen*, 520 F. Supp. 2d 802, 808 n.10 (E.D. Va. 2007) (applying the district's local rule which requires a court's permission before issuing a subpoena to appear for a deposition to any military officer holding the rank of Admiral (internal quotation marks omitted)); *Washington Post Co. v. Special Inspector General*, No. 18-2622 (ABJ), 2021 WL 4502106, *13 (D.C. Sept. 20, 2021) (discussing that, in the context of the Freedom of Information Act, the defendant's definition of a high-ranking official was an official appointed by the president and confirmed by the senate, which included admirals). Because the four are high-ranking officials, "the burden switches to Plaintiff to demonstrate the need for the testimony." *Conforto*, 2014 WL 12560881, *6.

### B. Vice Admiral Galinis

Plaintiff seeks to ask Vice Admiral Galinis about "leakby" as a cause of the contamination, about the presence of oil in other Navy ships' air systems, and about why, as a high-ranking official, Vice Admiral Galinis was involved in circumstances involving the expected presence of trace amounts of oil in ships' air systems. (ECF 33 at 9.) Plaintiff argues that these questions will answer whether contamination predated the flushing and whether other ships have similar oil contamination.

Plaintiff argues that it must depose Vice Admiral Galinis because he is the only person who can speak about the presence of oil in other ships' air systems and because he is the only person who can explain why he needed to be involved in the decisions about cleaning the air systems. (ECF 33 at 9.) Plaintiff references an email from a rear admiral to three other military personnel that states that, "[Vice Admiral Galinis] isn't convinced that this oil hasn't been there before and that it isn't the same on other ships," and "[Vice Admiral Galinis] does believe that you could have leakby on some systems internal to the HPAC that would result in oil in the air system," and that the rear admiral will compare other ships once they can find some to compare. (ECF 35 at 24.)

Although the email shows that Vice Admiral Galinis may be familiar with the issue of oil contamination in ships' air systems, it does not appear particularly unique in the context of the other information in the emails in Exhibit 1, which includes technical

discussions of testing for oil contamination in other ships' air systems and discussion of whether oil contamination predates Plaintiff's work on the ships. (ECF 35.) The emails are from military personnel of various ranks, and most are addressed to several military personnel of various ranks with many other military personnel copied on the emails. (*Id.*) The Court finds that Plaintiff fails to show that Vice Admiral Galinis has "unique first-hand, non-repetitive knowledge of the facts at issue in the case." *Conforto*, 2014 WL 12560881, at *3. As Defendant states, the daily briefings that occurred where not from the high-ranking officials Plaintiff seeks to depose but from other individuals who were directly involved in determining whether the contamination predated Plaintiff's work on the ships and whether other ships have oil contamination in their air systems.

The Court holds that an interrogatory that asks Vice Admiral Galinis about the two email statements attributed to him would allow Plaintiff to get the relevant information that is essential to its case without placing an undue burden on a high-ranking official. *See id.*, *6 ("[T]he party seeking to depose the official must show . . . the evidence sought is not available through less burdensome means or alternative sources." (internal quotation marks omitted)). Specifically, Plaintiff may ask Vice Admiral Galinis about the following two statements: (1) "[Vice Admiral Galinis] isn't convinced that this oil hasn't been there before and that it isn't the same on other ships"; and (2) "[Vice Admiral Galinis] does believe that you could have leakby on some systems internal to the HPAC that would result in oil in the air system." (*See* ECF 35 at 24.)

Plaintiff's reply argues that Vice Admiral Gilinis and Rear Admiral Ver Hage have direct knowledge by referencing "highly relevant statements to BAE System's former General Manager" from Vice Admiral Gilinis and Rear Admiral Ver Hage. (ECF 33 at 14.) Plaintiff neither identifies what those statements are nor explains their relevance.

**C. Vice Admiral Kitchener**

Plaintiff states that because Vice Admiral Kitchener is the Navy's surface commander, "the ships are, essentially, his." (ECF 33 at 10.) Vice Admiral Kitchener required that Plaintiff brief him every day over many months. (*Id.*) Plaintiff wants to ask

11

22-cv-00515-L-BGS

11

22-cv-00515-L-BGS

Vice Admiral Kitchener why he needed that level of briefing, and the only way Plaintiff argues it can find out is by deposing Vice Admiral Kitchener. (*Id.*) Plaintiff also wants to ask Vice Admiral Kitchener what he told others about the reason for the delay in returning the ships to service after the contamination was discovered. (*Id.*)

Plaintiff does not indicate how these questions will shed light on the questions of whether contamination was predated in the two ships and whether other ships had similar contamination, however. Without offering an explanation of how answers to those questions bear on a relevant issue in the case, *see Conforto*, 2014 WL 12560881, at *3 ("[T]he party seeking to depose the official must show the testimony is . . . essential to the case at hand."), Plaintiff fails to carry its burden.

**D. Rear Admiral Eric Ver Hage**

Plaintiff states that "[b]ecause the high pressure compressed air system tied to the ships' stations for self-contained breathing apparatus, the Navy conducted additional testing that showed the Sailors' health was not a risk." (ECF 33 at 9.) Over the following months, Plaintiff states that "Admiral Ver Hage and Mr. Haycock got nightly briefings from [Plaintiff] and the Navy about what to do in response to the findings." (*Id.*)

Plaintiff seeks to ask Rear Admiral Ver Hage "about his decision directing [Plaintiff] to re-flush the ships' air systems with [NOC]" when "[t]he contracts called for a heated Grade B water flush and not a flush using the Navy's most expensive cleaner (NOC), the use of which [Plaintiff] presumes requires an admiral's direction given its expense." (ECF 33 at 10.)

The Court finds that an interrogatory asking Rear Admiral Ver Hage the specific question identified would be sufficient to get the information Plaintiff seeks without placing an undue burden on Rear Admiral Ver Hage. *See id.*, *6 ("[T]he party seeking to depose the official must show . . . the evidence sought is not available through less burdensome means or alternative sources." (internal quotation marks omitted)).

Plaintiff also seeks to ask Rear Admiral Ver Hage "why he thought [Plaintiff] needed to 'Make it Right' when [Defendant] . . . knew all along that oil was expected to be present in its ships' air systems." (*Id.*) Plaintiff also seeks to ask Rear Admiral Ver Hage "about the Navy demand for nightly briefing regarding the efforts with the re-flushes, which they participated in for six months." (*Id.*)

These questions do not address whether the oil contamination predated Plaintiff's work on the ships or whether other ships had similar oil contamination. Again, without offering an explanation of how answers to those questions bear on a relevant issue in the case, *see Conforto*, 2014 WL 12560881, at *3 ("[T]he party seeking to depose the official must show the testimony is . . . essential to the case at hand."), Plaintiff fails to carry its burden.

### E. Rear Admiral Michael Haycock

Plaintiff seeks "to question . . . [Mr. Haycock] about [Defendant's] demand for nightly briefing regarding the efforts with the re-flushes." (ECF 33 at 10.) As the Court has discussed, the best sources for the briefings are the individuals with knowledge who briefed the high-ranking officials, not the high-ranking officials. Further, Defendant's reason for nightly debriefing is not relevant to the reasons for which Plaintiff seeks to depose the witness.

### F. Interference with Government Duties

The admirals currently hold positions at the top of their Navy divisions. Each has a tremendous amount of responsibility, "supervising thousands of uniformed service members and Navy civilian employees, managing multi-million-dollar budgets, and defendant protecting our national security." (*See* ECF 33 at 13.) The Court concludes that deposing the admirals would significantly interfere with the ability of the officials to perform their governmental duties. *See Conforto*, 2014 WL 12560881, *6.

## IV. CONCLUSION

The Court GRANTS the parties' joint motion for Permission to File Under Seal Exhibit 1 (ECF 34) and Plaintiff's motion for Permission to File Under Seal Exhibit 1 to

1  Plaintiff's Supplement to Joint Statement (ECF 40).  The Court declines to consider
2  Exhibit 1 to Plaintiff's Supplement, however.  The Court also declines to consider
3  Plaintiff's supplemental document.  (ECF 39.)  The Court GRANTS Defendant's motion
4  for a protective order.  (ECF 33.)

**IT IS SO ORDERED**.

Dated:  April 24, 2023

Hon. Bernard G. Skomal
United States Magistrate Judge